R. T. REEFY, TAXPAYER, V. ELYRIA (CITY) ET AL.

**Newspapers of "Opposite Politics" Determined by Record in Presidential Campaign of Previous Year.**

Whether two newspapers are of "opposite politics," within the meaning of the statute relating to municipal advertising, will be determined by their conduct and policy at a time when partisanship has sway and party organization and discipline finds expression in party platforms and declarations, rather than during a period when party feeling is quiescent and there is little or no political activity; hence, when a municipality enters into a contract for such advertising during the year following a presidential campaign, the question whether the two papers chosen are opposite or antagonistic in politics will be judged by their record during the campaign of the preceding year.

APPEAL.

## GRANT, J.

The petition alleges that the city of Elyria attempted to contract with the defendants, the Republican Printing Co. and the Chronicle Printing Co., respectively, for the printing by them of such matters and things as are by law required to be published in newspapers, pertaining to the affairs of said city, exclusively. These purported contracts are said to be illegal and void, and the prayer of the petition is that the execution of them and all payments under them be forbidden and enjoined.

This claimed illegality in the contracts awarded arises, so it is said, from the fact that the newspapers published by the defendants named, namely, the Evening Telegram, published by the first named, and the Elyria Chronicle, published by the latter of the two, are not newspapers of "opposite politics," as they are required to be by the law permitting the contracts in question to

be made. This is the sole issue appearing in this appeal, and it is the only question that will be discussed in this opinion. It is a matter of fact, to be determined upon all the circumstances of the case.

We say now, as we said at the argument, that the standard of political orthodoxy by which we shall measure the quality of these two newspapers as to whether they are "opposite" within the contemplation of the statute, will be their conduct and affiliations in the political campaign of 1912, and not their claims and asseverations now. We are not here to conduct a *post mortem* examination nor to administer "crowner's quest law." The time when those who seek the benefits of a course of conduct should speak or keep silent is when speech or silence is called for, and not when either will be inert. With newspapers as with men, "By their fruits ye shall know them," and "In the place where a tree falleth, there it shall lie."

It is not pretended that "politics," as used in the statute under which the contracts attempted to be awarded are allowed, is the word in its broad sense of comprehending the whole scope and office of government. It is used, all will agree, in its restricted sense of partisanship. Thus considered, the word signifies party preference and connection. It lives and exercises its force and brings its power to bear, through party organization and discipline and finds expression in party platforms and declarations of principles and in the utterances of candidates and leaders. In 1864 General McClellan openly repudiated the platform on which his party had placed him as its candidate; nevertheless, he claimed and had the allegiance of his party and was the incarnate exponent of its politics at the polls.

The word "opposite," when employed as the statute in question employs it, means antagonistic, having a different tendency, or character. Contrary is, perhaps, the most expressive as well as the most correct verbal equivalent by which the underlying concept of opposition can be voiced; it is, at least, sufficient for the purpose of this case. It does not permit a twilight zone in which, or under the shadow of which, neighbor Garford, or townsman Sharp may be supported by a paper masquerading as a political enemy to their party. It is not allowable, under this definition of the vital word, to make merchandise of journalistic

Reefy v. Elyria.

agencies by selling space to the minor candidates of one side while posing as the party exponent of the other side, in good and regular standing. What the statute clearly means is—"He that is not for me is against me; and he that gathereth not with me scattereth abroad."

Brought to this plain and easy test, and measured by its requirements, how stands the case at bar?

In the campaign of 1912 there were—among all—at least two political parties before the people of this nation and of Ohio and in every county in it. These two parties were known and designated as the Republican and Reform parties, respectively. Each had its candidates, state and national, each had fulminated its declaration of principles, and each was fighting for votes against the other. Not only were they antagonistic—contrary—to each other on paper and in the abstract, but it is too well known for dispute that in the concrete and in the persons of the candidates and down to the lowest stratum of their followers, they were at deadly enmity with one another. The feud was extremely bitter all down the line, from Taft and Roosevelt to the humblest job-hunter in Poorcuss county and the battler for constabulary honors in a wharf-rat precinct of the East Side. No better evidence of this ultra spirit of strife can be had than the admission of the publisher of the Chronicle, found in the record in this case, as to how he hated Taft, the head of the ticket which he now says he supported. It is impossible that the campaign should have been otherwise. The head of the Reform ticket—pre-eminently one of Homer's leaders of men—had, above all things, what John Randolph used to call "a talent for turbulence." And he is one of that kind of persons who manage to embroil pretty much everybody in his contagious quarrelsomeness. As between Republicans and the so-called Reformers, no one of either could keep out of the internecine fight of last year, nor could one dodge taking sides; Mr. John Dawkins, if he had been alive again, simply would not have been in it.

And yet, the publisher of the Chronicle maintains in this record and at the bar, that he did this impossible thing.

What he says is that, finding the good old republican ship in the hands of pirates, with William H. Taft as the Jolly Roger, to avoid seeing his party walk the plank he concluded to lend a

Lorain County Appeals.

hand at scuttling the craft.  Accordingly, he denounced the reg-
ular nominee of the party to which he now says he then owed
political allegiance.  He counseled the readers of his paper to
put a cross-mark over the state and national ticket of the party
to which he now claims he was then "opposite."  It is true, as
he says, that he advised also a cross at the head of the Republi-
can county ticket, but when he adds that there was no Reform
county ticket in the field, the merit of his advice in this respect,
considered from a partisan point of view, becomes elusive.  The
explanation that a part of this advocacy of candidates was paid
for does not improve the matter at the bar of political morals,
nor does it change the requirements of the statute.  At best, it
only undertakes to shift the transaction from the category of
political treason to that of party prostitution; the subject was
either in the enemy's camp or "on the street"—a political
*nymph du pave.*

It is true that on the trial it is denied that the platform—
which is only the form of declared principles—of the party
which the Chronicle now professes loyally to have served last
year, was in any way assailed last year.  We shall let the record
speak on this point.  In an editorial article published in the
Chronicle of August 9, 1912, the following language appeared:

"It is apparent that the republican party is no longer re-
publican in the sense that it stands as the representative party of
the people-at-large.  Since Taft and the representatives of spec-
ial privilege have committed the theft of the republican party,
there is no longer any hope for the common people from that
source.

"Roosevelt and the progressive party, by their confession of
faith and their party platform offer the relief that the masses de-
mand.  The platform is clear, progressive and does not waver
nor evade the issues of the present day.  The declarations stand
out clear and ring with true patriotism.  If the progressive party
should win at the election the country will be safe in Mr. Roose-
velt's hands."

It is true that in the same article something is said com-
mendatory of Mr. Candidate Wilson, also.  But neither Mr. Wil-
son nor his party is in this case, and neither need be mentioned
here; the fight is between Mr. Taft's party and the party of Mr.
Roosevelt, and in that fight the Chronicle says it was for the

Reefy v. Elyria.

former,—that is, it claims to have been of "opposite politics" to the latter. If this is so,—if the Chronicle was indeed Mr. Roosevelt's friend—and he surely *was*, in fact he says so,—then if Mr. Roosevelt were the prophet Job in all things—patience included —which he was not, by a long shot—why, then he might with the afflicted man of old have exclaimed: "Behold my desire is * * * that mine adversary had written a book,"—or rather, a newspaper.

This friendly enmity might be pursued a good deal further without traveling outside the record, but the quality of it may be found from the samples already given. Mr. Lincoln said the war could not be fought with squirtguns made out of elderstalks charged with rose-water, and enemies of the Roosevelt type do not usually assail each other with palm branches.

These being the facts, what was the status, in a party way, of the Chronicle in the momentous and highly quarrelsome campaign of 1912? Foraker was once defeated for Governor of Ohio because he maintained that he was "neither for nor against" prohibition in this state. Assuming, as surely we may, from its own confessions in this case, that the Chronicle was substantially in Foraker's plight, might it take that position and still claim benefit of clergy—or, rather, of the publication law that we are considering? What is the political status of a "neither for nor against" newspaper, in the eye of the statute in question? Some research here might be employed, usefully, perhaps, but ours can be but brief.

The late Mr. Barnum exploited Joice Heth, the Feejee mermaid, the Woolly Horse, the what-is-it, and other things of doubtful origin and function. We shall not undertake to assimilate any of these to the character assumed by the Chronicle last year. Our desire would be to place the Chronicle, in respect of the matter now under consideration, where the Chronicle has evidently placed itself, and we shall try to leave the Chronicle where the Chronicle has left itself—if we can find out where that is.

Hermes was the Greek Mercury, and the ancients all agree that he was what Fielding says Mr. Partridge, the schoolmaster, was—"a jolly brisk young man." Aphrodite, as is well known, was the Grecian Venus, and what her qualities were is matter of tolerably common knowledge among men today. Out of the two

names the wealthy English tongue has coined another—"Hermaphrodite,"—a name which, outside of politics survives chiefly and usefully in the rig of a craft known as an hermaphrodite brig. It does not signify a sexless being, but quite the reverse. It is bi-sexed,—so highly endowed is it with powers that make for increase of voters. If we go into the realm of sex-poverty—and certainly in these piping times of eugenic reform and all-around uplift we may do so—we shall find a product, sometimes incarnate in newspapers, which is not favored in the estimation of some men of the party to which the Chronicle upon the record here says is belongs. We may appeal with some degree of confidence to the words of a Republican of pristine days,—before Taft robbed the party of its ancient virtue,—and we shall expect every true and traditionally loyal member of the party, including the Chronicle, to agree and abide. It is the language of a Republican saint now in glory—if there is such a thing. We shall take no liberty with the words used, except such a necessary change of names and dates as shall serve to bring it up to the supreme occasion of 1912. He said:

"Mr. President, the neuter gender is not popular, either in nature or society. 'Male and female created He them.' But there is a third sex, if sex that can be called which sex has none, resulting sometimes from a cruel caprice of nature, at others from accident or malevolent design, possessing the vices of both and the virtues of neither; effeminate without being masculine or feminine; unable either to beget or to bear; possessing neither fecundity nor virility; endowed with the contempt of men and the derision of women, and doomed to sterility, isolation and extinction. But they have two recognized functions. They sing falsetto, and they are usually selected as the guardians of the seraglios of oriental despots. Geology teaches us that in the process of being, upward from the protoplasmic cell, through one form of existence to another, there are intermediary and connecting stages, in which the creature bears some resemblance to the state from which it has emerged and some to the state to which he is proceeding. History is stratified politics; every stratum is fossiliferous; and I am inclined to think that the political geologist of the future in his antiquarian researches between the triassic series of 1908 and the cretaceous series of 1912, as he inspects the jurassic Bull-Moose strata intervening, will find some curious illustrations of the doctrine of political evolution.

Reefy v. Elyria.

"In the transition from the fish to the bird there is an anomalous animal, long since extinct, named by the geologist the pterodactyl, or winged reptile, a lizard with feathers upon its paws and plumes upon its tail. A political system which illustrates in its practical operations the choice by the same leader, as twin door-keepers of his party's conscience, of Walter Brown and Jim Garfield, can properly be regarded as in the transition epoch and characterized as the pterodactyl of politics. It is, like that animal, equally adapted to waddling and dabbling in the slime and mud of partisan politics, and soaring aloft with discordant cries into the glittering and opasescent empyrean of reform."

If, on the other hand, we resort to Democratic authority for Wilson, it must be remembered, was commended by the Chronicle and it was urged at the bar in this case as an evidence of impartial political sexlessness last year, we shall run upon what on another occasion a western Milton—"inglorious," to be sure, but alas! by no means "mute"—let loose with, as follows:

"A Democrat fool who serves as a tool
  The men of his party to beat,
Deserves to be thrashed and have his head mashed,
  And kicked out into the street.

'Tis better to vote for some billy goat,
  That butts for his corn and his hay,
Than to vote for a man that has not the sand
  To stand by his party a day."

The unhappy condition of the political enuch in this country was more tersely but quite accurately likened by Randolph to that of the mule—"having neither pride of ancestry nor hope of posterity."

Not the least satisfactory evidence that the politically sexless status of the Chronicle must have existed in the heroic age of reform in 1912, and that it and the Telegram, its now enemy, according to the attempted contract of the Elyria council, were not of "opposite" but of the same, or substantially the same, politics, last year, we find in the attitude of the Telegram at the trial before us. The Telegram knew, it was more than once informed from the bench, that its own political standing was not

in dispute and that the court was with it in its contention that its contract with the council was not obnoxious to just legal criticism. Nevertheless, the Telegram attempted to say a word—yes, several words—to help out its co-defendant, the Chronicle, in its assertion of a right to participate in the publishing contract to the exclusion of a real, and not simulated opposition newspaper. When John Alden, as proxy for Miles Standish, went to court Priscilla, the girl asked him why he didn't say something for himself. This concatenation of good offices between two supposedly virulent foes, suggested an excellent mutual understanding as to the hoped-for distributees of the loaves and fishes embodied in the printing contracts. Plainly, the two are not political enemies, but in the substantial matters of practical partisanship are friends, just as in the like matters they were not enemies but friends in 1912,—working to the same ends, through a real community of political interests.

By its own confession in this case, the motives which impelled and shaped the political action and omissions of the Chronicle in the campaign of 1912, were in part a vindictive hatred of the head of the ticket to which it now claims it owed fidelity and entire service, and in part the pay it got for its support of state and local candidates. Neither one, nor both together, rose to the dignity of politics in the sense that the statute uses the word. And so far were either or both sets of motives from being ''opposite politics,'' as we have seen already, they were in substance and in fact of the same politics with the only paper to which the council of Elyria has thought fit to let its printing contract,—if indeed it can be said to have had any politics at all —Which we as matter of fact find was not the case.

The Chronicle, by its conduct in the campaign of 1912, voluntarily emasculated itself, politically. It, deliberately and of its free-will, unsexed itself, politically. It became, of its own accord, not of doubtful gender, but of no gender, politically. It is, we are certain, more charitable as well as more accurate, to take this view of the matter than to fly in the face of the notorious facts and the history of the Chronicle, and say that it was in 1912, a Republican newspaper, in full faith and fellowship with the Republican party, its organization, its discipline, its platform and its admitted leaders. And we regard this conclusion as more

Reefy v. Elyria.

honorable also to the Chronicle, in spite of its desire to hold on to its contract, at a very large expense, we think, to its reputation for consistency and for truth. We can not consent to the view that because matter printed in a newspaper is boilerplate matter, the publisher is relieved from the responsibility of giving it out to his readers as the opinion of his paper, or that commendatory mention of candidates shall not because paid for be exempt from a like responsibility; to take pay and then dodge the consequences only adds meanness to venality.

We find and hold that the Telegram was last year an opposition paper to another paper which is not a party to this action and whose status and fortunes are therefore of no concern to the court. But it was not in opposition to a paper battling manfully on its own side. To be "opposite" implies something to be opposite to. There was nothing in the political conduct of the Chronicle to which the Telegram could possibly be opposite,— unless, perhaps, it was to the confessedly merchandising support the former gave to local, and even non-partisan judicial, candidates, and on this point the record is silent.

One of two things, under the admitted facts of this case, must be true: In the campaign of 1912 the Chronicle either had no "politics," in the sense contemplated by the law we are to enforce here, or its "politics" at that time was of the Roosevelt or Reform brand. In the latter case its politics was "friendly politics." In neither case was it of "opposite politics" to the Telegram. "Politics" which in controlling matters is placed at the service of the other side and as to the rest is for sale to candidates for judges and understrappers, with a few crumbs donated to wealthy townsmen and neighbors,—such "politics," we say, is no "politics"; much less it is "opposite politics."

We leave the Chronicle in this respect where it has left itself, without any political status to support the contract which the council of Elyria undertook to make with the defendant, its publisher. It has disabled itself from making that contract and will not be allowed to have the benefit of a service which it can not render—that of a newspaper "of opposite politics" to another newspaper which had "politics."

We shall not accede to the alternative request of the defendant, the Chronicle Printing Co., that in the event of our reach-

ing the conclusion we have reached, then we shall declare both contracts void and thus send the matter back to the council for entire action *de novo*. There is no reason in law why this should be done. The two contracts do not fall under the same condemnation. There is admittedly no infirmity in the contract made with the defendant, the Republican Printing Co., and it is entitled to the avails of its bargain.

There is another and in our opinion a cogent reason for this determination. Where a body charged with a plain duty has shown a manifest disposition to ignore its obligation and to defeat the purpose of the law which imposes it, it is right, it is proper, for the courts to be equally astute in beating the game, if they can do so within the rules which control them. We think this can be done in this case by simply declaring void the purported contract between the city of Elyria and the Chronicle Publishing Co., without more. This we shall do. There will then be a valid and subsisting contract between the city and one of the two newspapers "of opposite politics" required by the statute. The city council of Elyria can do the rest. We abstain from further suggestion on the subject.

The drift of public opinion in this country now is towards more nonpartisanship in politics. The tendency is wholesome,— unquestionably. At any rate, the new policy has got to have its fling.

But it will not long remain so if we abandon the discipline and a certain sense of honor hitherto exerted by party organizations, and replace these with a lot of journalistic janizaries, who, confessedly having no principle, are to charge a high rate of interest on the vacuum thus capitalized into a mercantile asset. And an abdication of this power to the press,—which should be as Caesar's wife—without all the checks and safeguards of a jealous sense of public propriety, would be full of peril. It is a question whether it was not a newspaper office instead of the Temple, out of which the Master with a scourge chased the money-changers and the merchandisers.

On the other hand, there is a danger that—riding on the crest of the uplift wave—the best-intentioned reforms in the world may suffer from falling into the hands of irresponsible champions in the shape of visionaries and impracticables.

Full many a whim of purest ray serene,
The dark, unfathomed brains of uplift bear;
Full many a wheel was formed to whirr unseen
And waste its fleetness 'neath the Bull Moose hair.

The defendant, the city of Elyria, will be perpetually enjoined from proceeding further under its alleged contract with its co-defendants, the Chronicle Publishing Co. , A decree may be drawn accordingly.

WINCH and MEALS, JJ., concur.